# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JAMES H. KEARNS,**

        **Petitioner,**

**v.**                                     **Civil Action No. 1:09cv156**
                                                      **(Judge Keeley)**

**ADRIAN HOKE, Warden,**

        **Respondent.**

## OPINION/REPORT AND RECOMMENDATION
## ON RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

### I.   Procedural History

The *pro se* petitioner initiated this § 2254 habeas corpus action on November 17, 2009. [Dckt. 1] After a preliminary review of the file, the undersigned found that summary dismissal was not appropriate at that time and directed the respondent to show cause why the petition should not be granted. [Dckt. 9]

On March 8, 2010, the respondent filed an Answer and a Motion to Dismiss Petition as Untimely and Procedurally Defaulted. [Dckt. 13 & 14] Because the petitioner is proceeding without counsel, a Roseboro Notice issued the next day [dckt. 16], and the petitioner filed his response in opposition to the respondent's motion on March 16, 2010 [dckt. 18].

On April 20, 2010, the undersigned issued a Report and Recommendation ("R&R") outlining the petitioner's state court procedural history, restructuring his claims for clarity, and finding that the petition was timely filed. [Dckt. 19] In the R&R, the Court found that in his petition, the petitioner raised four grounds for relief: (1) ineffective assistance of counsel, with 40 specific

instances of alleged ineffectiveness; (2) trial court error, with 15 specific instances of error; (3) that

the State may have tampered with evidence involving a urine sample; and (4) that the state habeas

court abused its discretion by failing to allow habeas counsel to withdraw. *Id.* at 4-8.

With regard to the petitioner's ineffective assistance of counsel claims, the undersigned found

that the petitioner had expressly waived his right to pursue those claims in his first state habeas

proceeding, that those claims were unexhausted and procedurally defaulted, and that the petitioner

had failed to show cause and prejudice for his default. *Id.* at 16-17. Thus, the undersigned

recommended that those claims be dismissed with prejudice.

With regard to his claims of trial error, the Court noted that in his direct appeal and first state

habeas petition, the petitioner had alleged that the trial court erred when it:

> (1) failed to grant a mistrial following an outburst by a family member of the victim during
> the prosecution's opening statements;
>
> (2) failed to suppress a statement made by the appellant to the arresting officer (Trooper
> Doyle); and
>
> (3) admitted a video tape of the defendant making a statement (confession to reporter) to the
> new media while dressed in prison garb and appearing disheveled.

*Id.* at 19-20. Therefore, the undersigned found that these claims were exhausted and not barred by

a procedural default.[1] *Id.* at 20. Moreover, the Court found that in his federal habeas petition, the

petitioner challenged the trial court's admission of his confession to a reporter in restructured

grounds 2(b), 2(d) and 2(h), and his confession to Trooper Doyle in restructured ground 2(l). *Id.* at

20. Thus, the undersigned recommended that those grounds be heard on federal habeas review. *Id.*

---

[1]As the parties have pointed out in previous filings, the undersigned failed to note at this
point in the R&R that the petitioner also raised the issue of bribery of a witness in his first state
habeas petition, and that this ground was also exhausted. The Court did not overlook this ground,
however, it merely did not address the issue in more detail because the petitioner had not raised it
in his original federal habeas petition.

Additionally, the undersigned noted that although the issue related to the outburst by a family member was exhausted and not procedurally barred, that ground had not been raised in the petitioner's federal habeas petition, and that it would therefore, not be addressed further. *Id.*

With regard to the petitioner's tampering with the evidence claim, and claim that the state habeas court abused its discretion, the undersigned found that those issues had not been previously raised in state court. *Id.* Therefore, the undersigned found that those claims were not exhausted, had been waived, and were procedurally defaulted, and recommended that they be dismissed with prejudice. *Id.*

On May 4, 2010, the respondent objected to the R&R inasmuch as it found the petition timely and addressed the ineffectiveness of counsel as a basis for showing cause for a procedural default. [Dckt. 21]

On August 5, 2010, the district judge adopted the R&R over the respondent's objection and found the petition timely. [Dckt. 22] She also found all of the restructured grounds, except for grounds 2(b), 2(d), 2(h) and 2(l) procedurally defaulted, and therefore dismissed all but those four specific grounds for relief. *Id.* at 12. Moreover, the district judge referred grounds 2(b), 2(d), 2(h) and 2(l) back to the undersigned for further proceedings. *Id.*

In light of that Order, on August 10, 2010, the undersigned directed the respondent to file a response on the merits of restructured grounds 2(b), 2(d), 2(h) and 2(l). [Dckt. 24] The respondent did so on September 2, 1010, by filing a Motion for Summary Judgment. [Dckt. 27] Another Roseboro Notice was issued to the *pro se* petitioner [dckt. 29], and he filed a response to the respondent's motion on December 3, 2010 [dckt. 38]. That motion was stricken on March 18, 2011 because it exceeded the page limitations set forth in the local rules of this Court. [Dckt. 39] The

petitioner re-filed his response on April 5, 2011 [dckt. 41], and the respondent filed a reply on April 7, 2011 [dckt. 42].

This case is now before the undersigned for an R&R on grounds 2(b), 2(d), 2(h) and 2(l), the respondent's motion for summary judgment, and the response and reply.

## II.    Contentions of the Parties

### A.    The Petition

In the petition, the petitioner merely lists his grounds for relief without any additional factual support.  The grounds in the petition read as follows:

> Restructured ground 2(b) - The Court erred in allowing evidence of the media coverage of the petitioner's trial, where the confession of the petitioner before the media was overly prejudicial, and no proper ground was laid prior to its admittance, and the Court erred in not ordering a change of venue after learning that over half the jury had been exposed to the media coverage (ground 5 in the petition).

> Restructured ground 2(d) - The Court erred in finding the petitioner's media coverage confession voluntary when he was accompanied by Trooper Doyle who notified the press where they would be, and Petitioner was not cautioned by his attorney, and where the same was overly prejudicial to petitioner, and the State failed to lay a proper ground for its relevance (ground 9 in the petition).

> Restructured ground 2(h) - The Court erred in allowing the jury to view media video of Petitioner's confession, when Petitioner had been in handcuffs, and the prejudicial affect of the video outweighed any probative value to the State (ground 16 in the petition).

> Restructured ground 2(l) - The Court erred in ruling that Petitioner's confession to Trooper Doyle was voluntary, when Petitioner had expressly stated that he did not want to talk about the Moses incident, had signed his waiver form to talk to Doyle concerning the incident about his wife, and was later coerced and threatened by Trooper Whitt and Trooper Kimble, who failed to record their interview with Petitioner which made the confession of the Moses incident possible (ground 24 of the petition).

Petition [dckt. 1] at 6-7.

### B.    The Respondent's Motion for Summary Judgment

In the memorandum in support of his Motion for Summary Judgment [dckt. 28], the

respondent asserts that he is entitled to judgment as a matter of law for the following reasons:

(1) as there was no state action, the petitioner's confession to the media was admissible;

(2) the petitioner's change of venue claim in ground 2(b) is not exhausted and should be dismissed or severed;

(3) the petitioner's claim that Trooper Doyle alerted the media as to the time of the petitioner's arraignment does not render the petitioner's confession inadmissible;

(4) showing a videotape of the petitioner in an orange jumpsuit and cuffs did not deny him his right to due process; and

(5) the petitioner's statement to Trooper Doyle was admissible.

[Dckt. 28 at 10-25].

## C. <u>The Petitioner's Response</u>

In his response, the petitioner combines his arguments on grounds 2(d) and 2(l) as they both relate to the voluntariness of his confessions. [Dckt. 41 at 1]  Specifically, the petitioner argues that his confessions to the police and to the news media were not voluntary.  *Id.*  Moreover, he asserts that they were prejudicial, and the state failed to lay a proper foundation "as to why [it] had to use the tainted confessions." *Id.*

In addition, the petitioner combines his response on grounds 2(b) and 2(h) related to the prejudicial affect of the news coverage video shown to the jury.  *Id.*  Specifically, he asserts that the video, showing him in prison garb and shackled, was overly prejudicial and no proper ground was laid for its admittance.  *Id.*  Moreover, the petitioner argues that the trial court should have granted him a change of venue after learning that the jury had been exposed to the "prejudicial media coverage." *Id.*  This problem was then compounded he asserts, when the Court allowed the video to be shown to the jury during the trial.  *Id.*  In essence then, the petitioner asserts that his right to a fair trial was violated when the Court allowed in prejudicial evidence, when that evidence was

admitted without laying a proper foundation, and when the trial court failed to grant a change of

venue after being given good cause. *Id.* at 16-17. He also asserts, whether he was guilty or not, these

plain errors "set up a trial so fundamentally unfair" that he deserves a new trial. *Id.* at 17.

## D.   The Respondent's Reply

In his reply, the respondent mostly reiterates the arguments made in his motion for summary

judgment. [Dckt. 42] However, he specifically notes the following:

> (1) the videotape of the petitioner taken by a private news network and admitted under state rules of evidence was admissible and the petitioner's challenge is a question of state evidentiary law that is not cognizable on federal habeas review; and

> (2) the petitioner's confession to Trooper Doyle was not coerced and was admissible and the state's denial of this ground was not contrary to or an unreasonable application of federal law.

## III.   Standards of Review

## A.   Summary Judgment

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment

motions in habeas cases.  See Blackledge v. Allison, 431 U.S. 63, 80 (1977).  So too has the Fourth

Circuit Court of Appeals.  Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991).  Pursuant to Rule 56(c)

of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must

be obvious that no rational trier of fact could find for the nonmoving party.  Miller v. Federal Deposit

Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990).  However,  the "mere existence of a scintilla of

evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Anderson v Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id.</u> "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather then encourage mere speculation. <u>Anderson</u>, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-588 (1986).

**B.   Federal Habeas Review Under 28 U.S.C. § 2254**

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper. Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). However, the federal court may not grant habeas relief unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

The Fourth Circuit has determined "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.), cert. denied, 524 U.S. 830 (2001) (quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158.

A federal habeas court may grant relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently that this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "An unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

When a petitioner challenges the factual determination made by a state court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U. S. C. § 2254(d)(2). "In reviewing a state court's

ruling on post-conviction relief, we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

However, habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, *supra*.

Here, the remaining claims (restructured grounds 2(b), 2(d), 2(h) and 2(l)) were properly presented to the courts of the State. Consequently, the State's findings of fact and conclusions of law are due the appropriate deference.

## IV. Analysis

Although *pro se* petitions are to be liberally construed as set forth in Haines v. Kerner, 404 U.S. 519 (1972), habeas petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849 (1994). "[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." Blackledge v. Allison, 431 U.S. 63, 75, n. 7 (1977) (internal quotations omitted). A habeas petitioner must come forth with evidence that a claim has merit. Nickerson v. Lee, 971 F. 2d 1125, 1136 (4th Cir. 1992), cert. denied, 507 U.S. 923 (1993). Unsupported, conclusory allegations do not entitle a habeas petitioner to relief. *Id.*

### A. Evidentiary Grounds

Grounds 2(b) and 2(h) challenge evidentiary decisions made by the state trial court under the

West Virginia Rules of Evidence. Specifically, the petitioner alleges that the trial court erred by (1) admitting evidence of the media coverage of his trial, including an inculpatory statement/confession made by the petitioner to a reporter; and (2) allowing the jury to view media video of the petitioner in a prison jumpsuit and shackles.

However, claims based upon state law and procedure which do not infringe upon federal constitution rights are not cognizable under § 2254. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Evidentiary decisions do not rise to the level of a constitutional violation unless the petitioner can show that the ruling "offends . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Patterson v. New York, 432 U.S. 197, 202 (1977) (citations omitted). Otherwise, evidentiary issues are a matter of state law which are not cognizable on federal habeas review. See 28 U.S.C. § 2254(a) (A federal habeas petition may be entertained only on the ground that a petitioner is in custody in violation of the Constitution or laws or treatises of the United States); Wainwright v. Goode, 464 U.S. 78, 83 (1983) (per curiam) ("federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension . . . [i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

In this case, the petitioner challenges the admissibility of videotaped media coverage on the grounds that: (1) it was overly prejudicial, no ground was laid for its admittance, and it should have resulted in a change of venue, and (2) the jury saw the petitioner in a prison jumpsuit and shackles, robbing him of the presumption of innocence.

1. Videotape of Media Coverage

In this ground, the petitioner asserts that the videotaped media coverage should not have been

admitted into evidence for the jury to view. In support of this claim, the petitioner asserts that it was more prejudicial than probative, and that no ground was laid for its admittance. Neither of these reasons, however, implicates a fundamental principle of justice. The petitioner merely disagrees with the opinion of the trial court judge on an issue of state evidentiary law. Accordingly, this ground is not cognizable on federal habeas relief.

As to his claim that the trial court should have granted him a change of venue when it learned that the jury had been exposed to the media coverage, the basis of this claim is not entirely clear. Nevertheless, the record reveals that during a pretrial hearing held on March 24, 2000, the defense requested a change of venue. Resp't Ex. 19 at 21. In support of its motion, the defense asserted that the petitioner had a trial in another case less than one month before, and that his previous trial had generated a significant amount of publicity on the earlier crime and this one. *Id.* at 22. The defense requested a continuance to determine whether that publicity had affected the jury pool. *Id.* Apparently, the defense had hired the firm of Lopez and Associates to perform a survey on the jury pool, but the firm pulled out at the last minute and never completed the survey. *Id.* at 23. According to the defense, it had, however, received some of the preliminary survey results which indicated that a majority of the jury pool had some knowledge of the case. *Id.* at 24-25. The state argued that there was not enough information available at that time to sustain the defense's request for a change of venue. *Id.* at 24.

In making its ruling, the Court noted that having some knowledge of the case did not mean that the jury had formed opinions about the case, or that it would be difficult for the petitioner to receive a fair trial. *Id.* at 25. The Court noted that Rule 21 of the West Virginia Rules of Criminal Procedure set forth the appropriate standard for granting a motion to change venue. *Id.* That

standard is good cause, or more specifically,

> [t]o warrant a change of venue in a criminal case there must be a showing of good cause therefore; the burden of which rests upon the Defendant and the only person who, in any such case, is entitled to a change of venue. The good cause must exist at the time application for the motion is made. It's in the discretion of the Court. Good cause for change of venue as that phrase is used in the Constitution and in the Code means proof that a Defendant can not get a fair trial in the county where the offense occurred because of the existence of a locally extensive present hostile sentiment against him.

*Id.*

With that standard in mind, the trial court determined that

> [w]e don't have anything like that right now that you're shown me. Maybe these - - - I don't know what these surveys were designed to elicit from these people but - - -
>
> I think what I would do is . . . ask [general] questions here and then if there's specific areas we need to address on individual voir dire or their knowledge of the case we can do that back in chambers . . .
>
> and I'll caution then that if anyone asks them about their knowledge of this - - - or I'll ask them if they have knowledge of this case and I'll tell them I don't want to know what they know just whether or not anybody has any and then if someone does we'll make note of that and we'll address that separately back in chambers.

*Id.* at 25-26.

During general *voir dire*, the Court asked

> Do any of you know anything about this case, other than what you've been told here in Court this morning? I mean, have you talked to someone who claims to know something? Heard it discussed by someone who claims to be a witness? Or have you just heard it discussed in the community or have you seen anything on TV or in the newspaper or heard anything on the radio?
> But, now, just - - for those of you who answer that in the affirmative, raise your hand and get your names and then we'll go from there.
> Okay. Mr. Hites, Ms. Raines, Ms. Ash - - or Mr. Ash. I'm sorry.
> Anyone else in the jury box?
> Negative response.

*Id.* at 74.

Later, defense counsel informed the jury that the case involved the murder of 77-year old Dorthea Moses of Salem, West Virginia, in April of the previous year. *Id.* at 82. Defense counsel then asked if "that [rang] a bell with anybody." *Id.* In addition to the Mr. Hites, Ms. Raines and Mr. Ash, jurors Eakle and Garton also raised their hands. *Id.* at 82-83. After general *voir dire* was complete, the Court conducted individual *voir dire* of the prospective jurors to determine the extent of their knowledge about the case, and their beliefs on the penalty for First Degree Murder. *Id.* at 90.

As to Mr. Hite, he only vaguely recalled seeing news reports on the case and said that he had not formed any opinions or conclusions on guilt or innocence. *Id.* at 99. As to Ms. Raines, she stated that her mom had heard about the murder and asked her if she had heard about it. *Id.* at 123-24. However, Ms. Raines did not remember anything specific about the crime and she stated that she had not formed any opinions or conclusions about guilt or innocence. *Id.* As to Mr. Eakle, he remembered vaguely newspaper accounts of the crime, but only because the victim was the grandmother of somebody he went to school with. *Id.* at 145-48. However, Mr. Eakle was not friends with the schoolmate, and stated that he had not formed any opinions or conclusions as to guilt or innocence. *Id.* As to Mr. Ash, he stated that he lives in Salem and heard about the case there and on TV and in the newspaper. *Id.* at 160-63. Nonetheless, he had not heard many facts about the case, or at least did not remember them. *Id.* He then noted, however, that he felt very bitter about the murder at the time it happened, and that he was concerned about whether he could be impartial. *Id.* As a result, Mr. Ash was excused from the panel. *Id.* at 165. As to Ms. Garton, she stated that she saw news coverage of the crime after it had happened a year ago, but that she had never discussed it with anyone and had not seen any recent media coverage on the case. *Id.* at 181. She also vaguely

recalled seeing a picture of the house where the crime had occurred and hearing that it was a murder, but that she had not formed any conclusions as to guilt or innocence. *Id.* at 181-83.

In addition, a few other members of the prospective jury recalled hearing reports of a murder trial about to take place, and several others stated that they may have heard something on the TV or read something in the paper when the murder occurred. However, none of those media reports were recent, and none of those prospective jurors could remember any details about the case. They also all stated that they had not formed any opinions about guilt or innocence. However, one other potential juror, Mr. McCullough, admitted that he had seen a TV report of the case the night before and that morning, and that he had seen video footage of the petitioner confessing. *Id.* at 245-52. Nevertheless, Mr. McCullough said that he had formed no opinions or conclusions on guilt or innocence, and that he could fairly judge the evidence despite the media reports he saw. *Id.* Although defense counsel objected to Mr. McCullough serving on the jury, the judge noted that Mr. McCullough had indicated that he had not formed any opinions about the case, that he could be fair and impartial, and that he appeared to be sincere. *Id.* at 252-253. Accordingly, the judge did not dismiss Mr. McCullough at that time. *Id.* at 253.

After *voir dire* was complete, the following people were selected as jurors, Stephanie Garrett, Kathy Raines, John Stewart, James Sandy, Jodi Ash, Beth Garton, Clarice Helm, Jerry Brown, William Davidson, Mary Bailey, David Mall, Randall Workman and Sondra Mills. *Id.* at 274. Therefore, of the six people who specifically recalled seeing media reports of the crime or trial, only three of those were selected to serve as jurors. Moreover, each had stated that they had not formed any opinions about the petitioner's guilt or innocence, and that they could be impartial and fair. In addition, Mr. McCullough, the only juror who reported seeing the media confession, was not one of

the selected jurors.

Because a change of venue is clearly a matter of state law, the petitioner's claim is not cognizable on federal habeas review unless he can establish that the state court's denial of his motion rose to the level of a constitutional violation. As noted, the basis for this claim is not entirely clear. Nonetheless, it appears that the petitioner claims that the denial of his motion for change of venue violated his right to a fair trial. However, it is clear from the record that the trial court thoroughly considered the issue and meticulously questioned the potential jurors about what media coverage they saw, and whether it had any impact on their ability to be fair and impartial. Based on the answers of the potential jurors during *voir dire*, the court was confident that any media coverage had not impacted their decision making abilities. The trial court judge was present as the potential jurors were questioned and was able to gauge their truthfulness and sincerity. The trial court found that the petitioner had not shown that he could not receive a fair trial in the county were the crime occurred, and denied his motion to change venue. Resp't Ex. 18 at 35-37. The undersigned finds that the trial court applied the appropriate standard, and that it carefully weighed whether the petitioner had shown good cause for a change of venue. Therefore, the trial court's decision to deny the petitioner's motion for change of venue did not affect the fundamental fairness of his trial, and is not cognizable on federal habeas review.[2]

2.  Prison Jumpsuit and Shackles

In this ground, the petitioner challenges the admissibility of the video tape showing his confession to the reporter because he is shown wearing an orange prison jumpsuit and shackles in

---

[2]Because the Court finds that this claim is not cognizable on federal habeas review, the respondent's argument regarding failure to exhaust is moot.

the video.  Thus, the petitioner contends that the video was more prejudicial than probative, and that

it removed the presumption of innocence.

At trial, the trial judge determined that the tape was admissible and gave the jury the

following cautionary instruction:

> Okay.  While they're getting that ready, ladies and gentlemen, I'm going to give you an instruction here and I want you to pay close attention to this.  Now, in this video that you will see here in a minute, the defendant Mr. Kearns is shown in jail clothing and some kind of restraints.
>
> The Court wants to advise you that this is not unusual and the action is quite common for a person to be in jail clothing and restraints upon arrest and shortly thereafter be transported to an arraignment.
>
> The Court will caution you, though, at this point, that you must not let this prejudice you in any way against Mr. Kearns.  It must not be considered by you in any way on the issue of guilt.  You are to make no inference about his guilt from the fact that he appears this way in jail clothing and restraints in this video.  It is not to enter into your deliberations or your decision in this case.  You must be very careful not to let this influence your decision in any way.
>
> Although a person may be arrested or charged with a crime and placed in jail clothing and/or restraints, they are still presumed to be innocent until proven guilty beyond a reasonable doubt.

Resp't Ex. 19 at 671-672.

Upon an independent review of the record, the undersigned finds that the state court's

adjudication of this claim was not contrary to clearly established federal law.  Additionally, in light

of the evidence presented in the state court proceedings, the state court's adjudication of the

petitioner's claims did not  involve an unreasonable application of clearly established federal law,

nor did the state court's findings result in a decision that was based upon an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings.

Visible shackling affects the fairness of the factfinding process by undermining the

presumption of innocence and diminishing an accused's right to communicate with his attorney and

to participate in his own defense.  Deck v. Missouri, 544 U.S. 622, 630-31 (2005).  In addition, "the

use of shackles at trial affront[s] the dignity and decorum of judicial proceedings . . ." *Id.* (quoting

<u>Illinois v. Allen</u>, 397, U.S. 337, 344 (1970) (internal quotations omitted). Likewise, "an accused

should not be compelled to go to trial in prison or jail clothing because of the possible impairment

of the presumption so basic to the adversary system." <u>Estelle v. Williams</u>, 425 U.S. 501, 504 (1976).

However, this is not a case where the jury saw the defendant in an orange jail jumpsuit or

shackles at trial. The jury only saw the petitioner thus clothed and shackled when viewing videotape

evidence presented by the state. At that time, the petitioner was being transported from a jail to his

arraignment. The jury was specifically cautioned and instructed that such attire was not unusual in

that situation, and that it must not be considered when assessing the petitioner's guilt. Because the

rule of <u>Deck</u> and <u>Estelle</u> has not been extended to a situation where an accused is depicted wearing

jail garb and shackles in a videotape admitted under the rules of evidence, and the trial court gave

a proper cautionary instruction, this ground should be denied.

**B.** **<u>Voluntariness of Petitioner's Confessions</u>**

In restructured grounds 2(d) and 2(l), the petitioner challenges the voluntariness of his

confessions. First, the petitioner asserts that his confession to the reporter was not voluntary because

the news media was acting in concert with the police. Second, the petitioner asserts that his

confession to Trooper Doyle was not voluntary because the confession was made after he had

expressly stated he did not want to talk about the Moses incident and made a request for counsel.

1.   <u>Petitioner's Confession to the Reporter</u>

In this ground, the petitioner challenges the admission of his confession to a reporter on the

grounds that the reporter was acting in concert with the police. However, at trial, News Director

John Dahlia of WDTV New Channel 5 testified that on April 29, 1999, one of his reporters, Desiree

Anderson, learned that the petitioner would be doing his "perp walk"[3] that morning. Resp't Ex. 19 at 15. Therefore, she was dispatched to the courthouse that morning to follow the story and to ask questions. *Id.* Mr. Dahlia was later advised that Ms. Anderson asked the petitioner a question, and he confessed. *Id.* at 19. The alleged confession was caught on tape. *Id.* Mr. Dahlia further testified that while there is a personal working relationship between the news media and the police, neither his station nor his reporters are employed by the police, and they do not act as agents of the police. *Id.* at 21-22.

After hearing Mr. Dahlia's testimony, the trial court found the statement on the tape admissible. *Id.* at 37. The court further found that the statement was voluntary, that the reporter was not acting in concert with the police, and that she was not an agent of law enforcement. *Id.* The court found that Ms. Anderson was merely asking the questions she was instructed to ask by Mr. Dahlia, and that the police were not involved in her questioning of the petitioner. *Id.* The court also found that Mr. Dahlia had made an immediate copy of the original tape, that it was not altered or changed in any way, and that Mr. Dahlia could properly authenticate the tape, as the original was no longer available. *Id.* Moreover, the court noted that while Mr. Dahlia could not authenticate the petitioner's voice, that could be done by Trooper Doyle who was escorting the petitioner when he made the statement to Ms. Anderson. *Id.* at 38.

After an omnibus evidentiary hearing, the state court found that the petitioner's confession to the reporter had been properly admitted. Resp't Ex. 10 at 12. Relying on Mr. Dahlia's testimony at trial, the court found that the statement was voluntarily made, that there was no evidence that the questions were asked at the request of the police, or that the reporter's actions were intended to elicit

---

[3]When the accused perpetrator of a crime is brought to the courthouse for an arraignment.

a response that the State could utilize to prosecute the petitioner. *Id.* In addition, the court noted that there was no evidence that the State was responsible for creating the circumstances which resulted in the reporter being present at the scene to ask questions. *Id.*

Upon an independent review of the record, the undersigned finds that the state court's adjudication of this claim was not contrary to clearly established federal law. Additionally, in light of the evidence presented in the state court proceedings, the state court's adjudication of the petitioner's claims did not involve an unreasonable application of clearly established federal law, nor did the state court's findings result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In United States v. Garlock, 19 F.3d 441, 442 (8th Cir. 1994) (citing Colorado v. Connelly, 479 U.S. 157, 166 (1986)), the Eighth Circuit held that the constraints of the Fifth Amendment do not apply to purely private activity. The Eight Circuit recognized, however, that there are instances where the government exercises such control over a private actor that the private action can be attributable to the government for Fifth Amendment purposes. *Id.* at 443 (citing Fidelity Fin. Corp. v Federal Home Loan Bank, 792 F.2d 1432, 1435 (9th Cir.), cert. denied, 479 U.S. 1064 (1987). To make this showing, a defendant must establish that "in light of all of the circumstances," the private actor "acted as an instrument or agent of the government." *Id.* (quoting Skinner v. Railway Executives' Ass'n, 489 U.S. 602, 614 (1989). This test is satisfied by showing that "the government exercised such coercive power or such significant encouragement that it is responsible for [the private actors] conduct, or that the exercised powers are the 'exclusive prerogative of the government.'" *Id.* (citing, Fidelity Fin. Corp., *supra*).

In this case, the record shows that the reporter acted of her own accord and upon the advice

and encouragement of her news director. Moreover, there was no evidence presented which establishes that Ms. Anderson was tipped off by the police about the petitioner's arraignment. Although it is clear that the news media and the police have personal working relationships, Ms. Anderson was not acting as an agent of the state in this case, nor in concert with the police. Neither were her questions asked for the purpose of eliciting a response from the petitioner that could be used to prosecute him. Accordingly, this ground should be denied.

  2. <u>Petitioner's Confession to Trooper Doyle</u>

  In this ground, the petitioner asserts that his confession to Trooper Doyle was involuntary because he had expressly stated that he did not want to talk about the Moses incident, had signed a waiver form only concerning the incident about his wife, and was later coerced and threatened by Troopers Whitt and Kimble, who failed to record their interview with him which made the confession of the Moses incident possible.

  Prior to the start of trial, the Court made the following findings with regard to the petitioner's confession to Trooper Doyle,

> With respect to the statements made by Mr. Kearns to Trooper Doyle and Trooper Whitt - Sergeant Whitt, I think it was - now, the Court's analyzed that issue. And it would appear to the Court that although Mr. Kearns was arrested and brought in on these misdemeanor charges and was arraigned before the Magistrate -- at which time he requested counsel-- it's clear and really undisputed from the testimony that after that, he initiated the conversation with Trooper Doyle.
> And I think the law's clear in that regard that once counsel has been appointed, the police can't initiate any questioning of the defendant. But, Trooper Doyle testified that it was Mr. Kearns who initiated the conversation on the way down from the arraignment to the jail indicating that he wanted to talk with him. He wanted to explain what had occurred as far as his wife was concerned and, basically, to tell his side of the story. So, Mr. Kearns confirmed that in his testimony as well. So, we really don't have any dispute on that fact that this conversation was initiated by Mr. Kearns.
> And not only that, that once -- once they were downstairs, I think

Trooper Doyle asked Mr. Kearns whether or not he still wanted to talk to him. This was after the booking process, I believe. He said, "Yes." He again gave him his rights and explained his rights to him. There's no indication that he didn't understand his rights. And then he proceeded to tell Trooper Doyle about what occurred with respect to his wife.

Now, there were -- there did come a time during the taking of the statement that Mr. Kearns asked about a lawyer. Basically, I think he said, "I'm not going to answer that question as to whether or not I murdered Ms. Moses without a lawyer."

And Trooper Doyle explored that with him and said, "Well, if you want a lawyer, we'll stop. You tell me you don't want to talk anymore, because that's your right."

And I'm paraphrasing it. But it's in the transcript. There's no question about what's in there.

And he explored that with him and Mr. Kearns basically said, "I'm not just going to answer that one question. But I'll tell you anything else that happened that day."

But it went on and he continued to ask him some questions. At the end of the interview, he asked him whether or not he'd been threatened or promised -- threatened in any way or promised any reward -- did they treat him badly in any way -- just, basically, the statement was voluntary. And Mr. Kearns indicated that he had received no threats or promises. He gave the statement voluntarily.

Now, subsequent to that is when Sergeant Whitt then questioned Mr. Kearns and, again, advised him of his rights and <u>Miranda</u>. According to the testimony and the evidence that the Court has before it, it would appear that Mr. Kearns understood his rights and voluntarily waived his rights and talked with Sergeant Whitt.

And then subsequent to that, Trooper Doyle then again questioned Mr. Kearns and Mr. Kearns again gave a statement to Trooper Doyle about these matters, particularly with respect to Ms. Moses.

The Court believes that based upon the totality of the circumstances and the court's review of the recent case of <u>State v. Bradshaw</u> that was authored by Justice Cleckly, as well as the other cases that counsel cited . . . it talks about an equivocal request for counsel during interrogation and the Court found that case helpful in determining whether or not the mention of an attorney by Mr. Kearns during the course of his statement made the statement invalid.

Anyway, the Court believes that based upon the totality of the circumstances based upon the preponderance of the evidence, that the State has proven that the statements were voluntarily made; that they were made after Mr. Kearns was advised of his <u>Miranda</u> Rights; that any statement taken after he was appointed an attorney was taken based upon his initiation of the conversation; that throughout the interview of what the Court can tell, based

upon the testimony of Mr. Kearns, as well, there was no mistreatment of Mr. Kearns. No threats of any kind were made. No promises of any kind were made. The statements were voluntary in nature and that he understood his rights under <u>Miranda</u>. Taking everything into consideration and that he voluntarily waived those rights and made these statements to the law enforcement authorities.

Resp't Ex. 19 at 7-11.

After an omnibus evidentiary hearing, the state habeas court found

> For a recantation of a request for counsel to be effective: (1) the accused must initiate a conversation; and (2) must knowingly and intelligently, under the totality of the circumstances, waive his right to counsel . . . When examining the voluntariness of a confession, a determination must be made as to whether the defendant knowingly and intelligently waived his constitutional rights' and whether the confession . . . [was] the product of an essentially free and unconstrained choice by its maker . . .
>
> The Court notes that a review of the August 28, 1999 transcribed statement of Petitioner to Doyle, indicates that the statements made to Doyle were voluntary. In fact, Doyle's testimony and the transcript indicate that the Petitioner initiated the conversation.
>
> After the Defendant initiated the conversation, Defendant was read his Miranda rights, and filled out a 'Miranda Rights Form' indicating that he waived his right to an attorney.
>
> The transcript of Petitioner's statement and Doyle's testimony reveal no evidence of threats, promises or coercion to obtain these statements.
>
> Therefore, the Court finds that the Petitioner understood his rights and, by initiating the conversation with Doyle, Petitioner voluntarily waived those rights.

Resp't Ex. 10 at 10-11.

<u>Miranda</u> warnings, as they are well known, advise a defendant that he has the right to remain silent and to have an attorney present. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). If a defendant invokes his right to an attorney during custodial questioning, the questioning must cease. *Id.* However, a defendant's invocation of his right to counsel must be unambiguous. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981). In other words, a defendant "must articulate his desire to have

counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459-62. If the right is invoked for only a discreet, limited purpose, Edwards does not apply to questioning for other purposes. Connecticut v. Barrett, 479 U.S. 523, 528-29 (1987). Moreover, if the defendant "initiates further communication, exchanges, or conversations with the police," even after invoking his right to counsel, the police may resume interrogation. Edwards, 451 U.S. at 484-85. Ultimately, however, the test remains the test of voluntariness. Arizona v. Fulminante, 499 U.S. 279, 303-04 (1991) ("Is the confession the product of an essentially free and unconstrained choice by its maker?").

Trooper Doyle testified that when he arrested the petitioner on the misdemeanor charges, he did not read the petitioner his Miranda rights because he had intended to simply arrest the petitioner and take him by car to an arraignment where he would be advised of his rights. Resp't Ex. 18 at. 47. Trooper Doyle had not intended to talk to or question the petitioner during the car ride. *Id.* However, after overhearing Trooper Doyle speaking to dispatch about possibly siting Dorthea Moses' car, the petitioner blurted out that he could take Trooper Doyle to the keys for that car. *Id.* at 42. The petitioner did in fact take Trooper Doyle to the location of the keys. *Id.* at 45-46.

After arriving at the Magistrate's office for his arraignment, it is undisputed that the petitioner made an unequivocal request for counsel. Resp't Ex. 19 at 7. However, shortly thereafter, the petitioner initiated a conversation with Trooper Doyle about the misdemeanor crimes he was charged with and he signed a Miranda waiver. Resp't Ex. 18 at 48-55. During his conversation with Trooper Doyle, the petitioner stated that he had gone to his wife's house to kill himself with a pistol. *Id.* at 57. When questioned about where he had obtained the gun, the petitioner advised Trooper Doyle that he had obtained the gun from Dorthea Moses' house. *Id.* The petitioner then explained

to Trooper Doyle how he knew Ms. Moses. *Id.* at 58. Eventually, the conversation turned to whether the petitioner had any information about Mrs. Moses' death, and he ultimately confessed to killing her. *Id.* at 58-60.

In between the time of the petitioner's initial statements, and his confession to Trooper Doyle, the petitioner was questioned by two members of the West Virginia State Police who specialize in polygraph examinations. *Id.* at 60. The petitioner had agreed to talk to them, and according to Sergeant Whitt, one of the officers, the petitioner confessed to murdering Mrs. Moses. *Id.* at 61.

During his subsequent questioning by Trooper Doyle, the petitioner was asked if he was involved in the murder of Dorthea Moses. *Id.* at 62. The petitioner answered, "I'm not going to answer that question . . . not without my lawyer." *Id.* He then stated, "No, that's one question I'm not going to answer . . ." *Id.* To clarify, Trooper Doyle specifically stated, "I want to make sure it's clear, are you asking for a lawyer now . . . because I'll stop talking if you want me to." *Id.* The petitioner responded, "I just don't want you to ask that question but we'll talk about anything else that happened that day." *Id.* The petitioner continued to freely talk to Trooper Doyle after that. *Id.* at 63.

Upon an independent review of the record, the undersigned finds that the state court's adjudication of this claim was not contrary to clearly established federal law. Additionally, in light of the evidence presented in the state court proceedings, the undersigned finds that the state court's adjudication of the petitioner's claims did not involve an unreasonable application of clearly established federal law, nor did the state court's findings result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court

proceedings. Accordingly, this ground should be denied.

## V. Recommendation

For the reasons stated, the undersigned recommends that the respondent's Motion for Summary Judgment [dckt. 27] be **GRANTED**, and grounds 2(b), 2(d), 2(h) and 2(l) be **DENIED with prejudice.**

Within **fourteen (14) days** after being served with a copy of this Opinion/Report and Recommendation, any party may file with the Clerk, written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: May 3, 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE